329 So.2d 784 (1976)
Claude B. TRICHE, Plaintiff-Appellee,
v.
COMMERCIAL UNION INSURANCE COMPANY et al., Defendants-Appellants.
No. 10550.
Court of Appeal of Louisiana, First Circuit.
January 12, 1976.
On Application for Rehearing April 12, 1976.
*785 Joseph J. Weigand, Jr., Houma, for defendants-appellants.
*786 Grady Weeks and Douglas Authement, Houma, for plaintiff-appellee.
Before SARTAIN, BAILES and PICKETT, JJ.
PICKETT, Judge.
Defendants-Appellants, John Monterio Construction Co., Inc., its employee, Robert F. Eschete, Sr., and its liability insurer, Commercial Union Insurance Company, bring this appeal from a judgment rendered against them, in solido, in favor of Plaintiff-Appellee, Claude B. Triche, in a personal injury suit brought by the said Plaintiff-Appellee seeking recovery for personal injuries, pain and suffering, loss of wages, past and future, and medical expenses resulting from a motor vehicle collision that occurred on February 9, 1973, in Terrebonne Parish, involving Plaintiff-Appellee and Robert F. Eschete, Sr., employee-driver of a vehicle owned by John Monterio Construction Co., Inc.
Plaintiff-Appellee answered the appeal and asked that the $149,326.91 judgment of the District Court be increased to $278,391.86, and, as thus amended, affirmed.
Undisputed facts are that Claude B. Triche, age 45 years, on or about February 9, 1973, at about 4:55 o'clock A.M., was driving his 1968 Chevrolet pickup truck in a westerly direction on Hollywood Road, in Terrebonne Parish, Louisiana, at a speed of approximately 25 to 30 m. p. h. in his own right hand lane of travel. At that time rain was falling, and the weather was cold. The highway was a two-lane, hardsurface road. A private driveway entered this highway from the North (Plaintiff-Appellee's right), and it served as a means of entrance and exit to the site of the John Monterio Construction Co., Inc., Defendant-Appellant. As Plaintiff-Appellee was passing this driveway, a motor vehicle (pickup truck) owned by said John Monterio Construction Co., Inc., and operated by Robert F. Eschete, Sr., acting within the scope of his employment with said construction company, drove said motor vehicle onto Hollywood Road and struck Plaintiff-Appellee's vehicle, which, as previously stated, was travelling in a westerly direction.
Mr. Robert F. Eschete testified that he planned to enter Hollywood Road and turn to his right, and proceed in a westerly direction, which was the same direction Plaintiff-Appellee was travelling. Mr. Eschete said he looked to his left before entering Hollywood Road, but admitted that the left window of his pickup truck was at least partially iced up, impairing his view, and that he did not see Plaintiff-Appellee's vehicle until right at collision. Mr. Eschete had proceeded approximately 3 feet onto Hollywood Road when he struck the Triche vehicle.
State Trooper Gary Burnett testified there were no obstructions to prevent Mr. Eschete from seeing the Triche vehicle, and was of the opinion that the cause of the accident was Eschete's improper entry of the highway. He found no negligence on the part of Mr. Triche. The highway at this point was straight.
Mr. Claude Triche testified that he never saw the Eschete vehicle until it struck him. The evidence firmly establishes, by a preponderence of the evidence, that the collision was caused solely by the negligence of Mr. Eschete. We concur with the findings of the Trial Court that the said Robert F. Eschete was negligent, in that the said Mr. Eschete,
1. Did not have or maintain his vehicle under proper control.
2. Did not maintain a proper lookout.
3. Did not see that which he ought to have seen.
4. Was driving said vehicle in a careless and reckless manner.
5. Failed to yield right of way.
Defendants-Appellants had plead the special defense of contributory negligence *787 and now strongly urge that Mr. Triche was contributory negligent, and that this contributory negligence would bar his recovery.
The facts do not support this special defense. The record establishes that the Plaintiff-Appellee did not see the Defendant-Appellant's vehicle prior to impact. Furthermore, as was re-affirmed in the case of Clark v. Allstate Insurance Co. et al., La.App., 279 So.2d 237, it is only in the exceptional case where the right-of-way motorist could have avoided the accident by the exercise of the very slightest degree of care that he will be considered guilty of negligence.
Plaintiff-Appellee, as the driver on the main, or preferred thoroughfare, had a right to assume that all vehicles entering onto this favored, public highway from private entrances would respect his right of way, and stop and yield the same. Clark v. Allstate Ins., Co., cited supra; Koob v. Cooperative Cab Co., 213 La. 903, 35 So.2d 849; Fontenot v. Lucas, La.App., 228 So.2d 211.
The preponderance of the evidence also establishes that Mr. Eschete was acting within the course and scope of his employment for the Defendant-Appellant, John Monterio Construction Company, Inc., and, accordingly, his acts of negligence are imputed to his said employer, and to its public liability insurer, Employers Commercial Union Insurance Company, to the extent of its policy limits.
On the question of quantum of damages, we note initially that the State Trooper had reported no personal injuries sustained by either party. Mr. Triche testified as follows concerning how he felt right after the collision:
"A. I had a slight pain in my right side. It was so cold, and I was nervous on the wreckI told the State Trooper I wasn't hurt."
The medical evidence establishes, beyond question, that Mr. Triche in fact had a hernia, for which he underwent surgery on April 30, 1973, in the Terrebonne General Hospital, Houma, Louisiana.
It also establishes that he had two ruptured, or herniated, discs in the lumbar sacral (L 4-5 and L-5 S-1) region of his back for which he underwent surgery in June, 1974.
These two herniated discs were removed at that time, and a bilateral lumbar sacral fusion accomplished, resulting in a residual disability of 15% to 20% of his back. This disability removed him from the labor market as a manual laborer.
The real issues before the Court are related to determining whether these two medical problems, i. e., the hernia and the ruptured disc, or either of them, were caused by the accident of February 9, 1973.
The first Doctor to see Mr. Triche following the accident was his family physician, Dr. Thomas Givens. He examined Mr. Triche on February 15, 1973,six days after the accident. At this time Mr. Triche complained of back pain. The Doctor found muscle spasms in the lumbar sacral group, and gave a diagnosis of lumbar sacral muscle strain. He next saw Mr. Triche 12 days later, on February 26th, at which time Mr. Triche was still complaining of back pain, and Dr. Thomas referred him to Dr. Richard Landry, Orthopedic Surgeon. Dr. Thomas subsequently saw Mr. Triche on March 8, 16, 30th, and April 13 and 27th. On each occasion Mr. Triche complained of back pain. Additionally, on the visit of March 16th, Dr. Thomas noted an inguinal hernia on the right. On the April 27, 1973, visit, which was the last time Dr. Thomas saw him, Mr. Triche again complained of the hernia, and Dr. Thomas referred him to Dr. Phillip Cenac for that problem.
Dr. Thomas expressed the opinion that, based on the history given by Mr. Triche, *788 the back problems originated with or were aggravated by, the accident of February 9th.
Dr. Thomas expressed no opinion about the hernia problem.
Dr. Phillip Cenac, however, was familiar with Mr. Tricne's hernia problems, having first seen him in 1971, at the Houma Medical Clinic. At this time Mr. Triche underwent surgery, which was performed by Dr. Felix Mathieu and Dr. Mack Thomas, for bilateral hernia repairs. His recovery was uneventful and he was ultimately discharged with no residual medical problems.
Dr. Cenac next saw Mr. Triche on April 27, 1973, as a referral by Dr. Thomas Givens. Examination revealed a mass in the right inguinal area, and surgery was performed on April 30, 1973, at which time the hernia was repaired. This hernia was small and was located at a point above the suture line of the previous hernia surgery of 1971.
Dr. Cenac expressed the opinion that the hernia was related to the accident of February 9th.
Dr. Cenac testified that the hernia was in absolute accordance with the accident of February 9th, and, although he could not say with absolute certainty that the accident related trauma caused the hernia, he expressed the opinion that the hernia was related to the accident.
He further testified that an individual who undergoes hernia surgery of this type is normally disabled from 8-10 weeks, or 12 perhaps, and that most men return to their occupations after this type of surgery.
Dr. Dexter Gary, Orthopedic Surgeon, first saw Mr. Triche, in consultation with Dr. Thomas Givens, on July 2, 1973, and examined him with reference to back pain. After conservative treatment failed to produce relief, Dr. Gary asked for a consultation with Dr. John Jackson, a neurosurgeon of New Orleans. The evidence does not reveal any of the findings of Dr. Jackson, other than the statement by Dr. Gary that Dr. Jackson's report was the same as his, and, also, that Dr. Jackson suggested a myelogram. Dr. Gary caused a myelogram to be performed in November, 1973, and it appeared to be within normal limits, but a widening space between the posterior body of the lumbar spine and the dura which covers the nerve roots was noted. The significance of this was explained by saying that in an increased interspace a herniated disc can be present and not be seen on a myelogram. Subsequent review caused the Doctor to suspect a ruptured disc at the L 5-4 disc level, and narrowing of L5-S-1 interspace were noted. In April, 1974, a discogram was performed pursuant to Dr. Gary's instructions. This test led to the conclusion that the L 5-4 and L-5 S-1 were abnormal and compatible with herniated discs. On June 13, 1974, Mr. Triche underwent a two level laminectomy for excision of herniated discs, and a bilateral lumbar sacral fusion. Dr. Gary estimated 15% to 20% permanent physical impairment of the back, and testified that Mr. Triche could no longer perform work that would require repetitive, or heavy lifting, or jobs that would entail heavy labor.
It was Dr. Gary's opinion that Mr. Triche was one hundred percent disabled from heavy manual labor, and that if he returned to this type of work he would suffer additional injury.
It was also Dr. Gary's opinion, based on the history of Mr. Triche, and the medical findings subsequent thereto, that the above referred to injuries to Mr. Triche's back occurred in the accident of February 9, 1973.
We find that the evidence amply supports the conclusion that the said back injuries were in fact received in the said accident, and resulted in the disabilities testified to by Dr. Gary. To be more specific, this Court accepts, as having been established by competent evidence, that because of back injuries sustained by Mr. Triche in the accident of February 9, 1973, *789 Mr. Triche has suffered 15%-20% permanent disability to his back, and that he cannot perform manual labor without injury to his back, and that he in fact should not perform manual labor.
This brings us to matters involving a determination of a just and adequate quantum of damages.
The jurisprudence of this State is well stated in the case of Barrois v. Service Drayage Co., La.App., 250 So.2d 135, in which it was held:
"A successful plaintiff in an action in tort is entitled to compensation for the following damages, where proven in the evidence: (1) loss of past and future earnings; (2) past and future pain and suffering; (3) permanent disfigurements and disabilities; and (4) actual medical and related expenses. Brignac v. Pan American Pet. Corp., 224 So.2d 84 La.App.3rd Cir., 1969)."
LeBlanc v. Metal Locking of Louisiana, Inc., et al., La.App., 258 So.2d 683, 689, approached a consideration of loss of future income in the following manner:
"We must now determine a reasonable and fair amount of damages to compensate for the loss of future income. In so doing we must bear in mind that the Supreme Court in the case of McFarland v. Illinois Central Railroad Company, 241 La. 15, 127 So.2d 183 (1961), proscribed the ascertaining of loss of future earnings by computation based solely upon work-life expectancy. Also, in the case of Stanford v. Bateman Frozen Foods Company, 149 So.2d 753 (La.App. 1963), the First Circuit reaffirmed that the application of the mathematical formula based upon work expectancy could not be utilized in determining the loss of future wages. Recognizing the difficulty of determining with reasonable certainty and probability the loss of future earnings in the absence of any scientific and mathematical basis for so doing, the Supreme Court, in the case of Viator v. Gilbert, supra, indicated the standard to be used in making such a determination:
"* * * [C]onsideration must be given to the settled jurisprudence of this Court that allowance of monetary damages for loss of future earnings (or support of dependents in case of death) cannot be calculated with mathematical exactitude; that they are speculative in character and the "* * * most that the courts can do * * * is to exercise a sound judicial discretion and award such amount as, all the circumstances considered, may seem just to both litigants and not unduly oppressive to either." * * *' 253 La. 81, 216 So.2d 821, at 822-23."
The evidence established that Mr. Triche was forty-five years old at the time of the accident; that he only had a 5th grade education and is not qualified to do any job except manual labor. The evidence further established that if he does now perform manual labor he will be in danger of additional and serious and painful injury to himself.
Each of Mr. Triche's employers since 1969 testified that Mr. Triche, because of his experience and educational background, was qualified only to do manual labor, and each of them stated, in turn, that they had no job for Mr. Claude Triche if he could not do manual labor. Each testifying employer stated that Mr. Triche was not qualified as a supervisory employee.
The evidence establishes that Mr. Triche was employed by Universal Iron Works as a manual laborer from 1969 to Janury 30, 1973, at which time he quit and went to work for Houma Steel at $600.00 per month, as a foreman. The foreman job entailed manual labor.
At the same time he had a second job, at Mack's Oyster House, shucking oysters, at $84.00 per week.
Following the accident of February 9, 1973, Mr. Triche discontinued his job at *790 Mack's Oyster House, because he was physically unable to perform the work, which was, as indicated, in addition to his primary employment with Houma Steel. Following the accident, and because of the injuries he received in the accident, Mr. Triche was unable to adequately perform his work as foreman, and was relieved of this job and assigned to another job, as a truck driver. This job became progressively harder for him to perform, and he complained frequently of his injuries. Eventually he quit, on January 21, 1974, because of these problems, and went back to work for Universal Iron Works, at $3.75 per hour, for an average work week of 40 hours, 5 of which were overtime. He worked for Universal Iron Works from January 21, 1974, through May 4, 1974.
The Trial Court accepted the testimony of Dr. Melville Wolfson as to what the evidence established regarding damages due Mr. Triche for lost past earnings, and this Court likewise accepts same, which are, in summation, as follows:

"Past Earnings
(a) Mack's Oyster House:
 $84.00 per week
 Loss of earnings from date of accident to trial date
 $84.00 × 48 weeks = $ 4,032.00
(b) Universal Iron Works and Houma Steel, Inc.
 From date of accident to date of trial plaintiff averaged
 $560.33 wages per month. Plaintiff was unable to work
 from 5/4/74 through 11/5/74, or a six month period, due
 to the laminectomy and subsequent disability.
 $560.33 × 6 months = $ 3,361.98
(c) Mr. Claude Triche's income after the accident was less than
 before the accident due to his absence from work. From
 1969 to the date of the accident, Mr. Triche's monthly income
 averaged $688.00, but due to his absence from work
 after the accident his income from the date of the accident
 to 5/4/74 was only $560.33. The difference of Mr. Triche's
 income prior to the said accident and subsequent to the
 accident was $128.47.
 $688.00 income prior to accident
 560.33 income subseq. to acc.
 $128.47 difference in monthly income.
 Mr. Triche actually suffered a loss of $128.47 per month
 for the period from 2/9/73 through 5/4/74 or a 15 month
 period$128.47 × 15 months = $ 1,927.05
TOTAL LOSS OF PAST WAGES ......................................... $ 9,321.03"

We concur in the finding of the Trial Court that when the accident of February 9, 1973, occurred Mr. Triche was working at two jobs. While his primary job at the time of the accident was with Houma Steel, Inc., the Trial Court refers to his permanent employment being with Universal Iron Works. The evidence is that Mr. Triche worked for Universal Iron Works, Inc., beginning in 1969 through January 30, 1973, *791 at which time he was employed by Houma Steel, Inc. This employment continued until January 21, 1974, at which time he discontinued working for Houma Steel, Inc., and went back to work for Universal Iron Works, Inc., where he remained until May 4, 1974, at which time he quit working in order to have back surgery. The Trial Court's finding that Mr. Triche's wage earnings from his primary employer for that year were $8,265.58. This figure is supported by the evidence. His secondary employment was with Mack's Oyster House, Inc., and from this job he had an income averaging $4,032.00 per annum.
Dr. Melville Wolfson testified that Mr. Triche, at age 45 years, had a life work expectancy of nineteen (19) years. This testimony was based on a table devised by the Bureau of Labor Statistics tabulations furnished by the U. S. Department of Labor, which was published in the June, 1971 Monthly Labor Review. Based on this testimony, we accept, as a proven fact, that Mr. Triche's work-life expectancy at the time of the accident was 19 years.
Plaintiff sought to enhance loss of future earnings with testimony regarding a projected productivity rate factor of 3%. We think the Trial Court acted correctly in rejecting this concept, in this particular case, since it involves a 45 years old man whose future employment would be limited to the area of manual labor. We concur in the opinion of the Trial Court that an application and increase in the increase productivity rate factor would have proper application in the skilled and professional employment areas because there is among these classifications for employment wider range of possible increase of one's expertise; whereas in the case of a manual laborer the wage remains standard. Also, in the area of manual labor young energy and strength are factors more desired than accumulating experience with age, accompanied by a continuing loss of strength and energy due to one becoming older.
Likewise the suggested projected future inflation factor of 3% Is rejected as being too speculative.
It has been determined herein that Mr. Triche's annual earning ability is $8,265.58, from his primary employment. Normally, he would be paid by the week, semi-monthly, or monthly, as a wage earner. For this reason the Trial Court concluded that the correct procedure, in arriving at a judgment figure for loss of future wages from this primary employment, is to apply the provisions of LSA-R.S. 47:2405, which provides a discount at the rate of six per cent (6%) compound interest annually. We concur in this application, the result of which is as follows:
"Primary employment
$8,265.58 per year for 19 years discounted
at 6% compound interest per annum
($8,265.88 × 11.158116)
has a present value of $92,228.20"
We cannot concur, however, with the finding of the Trial Court that the work-life expectancy of Mr. Triche as related to his "second" or "moonlighting" job should be limited to three years. We find no evidence in the record, medical or otherwise to support this limitation.
We find no distinction between an individual working long, hard hours on one job, and that same individual working regular hours on one job, and additional hours "moonlighting" on a second job.
We find no jurisprudence in this State distinguishing "primary" employment from "secondary" employment in determining loss of future wages, or loss of future earning capacity.
25 C.J.S. Damages § 86, p. 950 contains the following statement:
"Where the injured person is engaged in two occupations, he may show the value of his services in both capacities to be greater than it would be in one exclusively, and a recovery for the loss of *792 time and earnings in both occupations is not double recovery."
Accordingly, judgment as to loss of earnings on Mr. Triche's "second" or "moonlighting" job, should be determined on the basis of $4,032.00 per year, for a work life of 19 years, as follows:

$4,032.00 per year for 19 years discounted
at 6% compound interest per annum
($4,032.00 § 11.158116) $44,989.52

With reference to the items, past and future suffering:

(a) Inguinal hernia $ 3,000.00
(b) Herniated disc $30,000.00

as found by the Trial Court, we concur, the evidence amply supporting these awards, and same being within the sound discretion of the Trial Court.
We also concur in the award of $4,000.00 as medical expenses, these expenses being supported by the record.
For the foregoing reasons the judgment of the Trial Court is amended to increase the total loss of future earnings to $137,217.82.
To recapitulate, the judgment of the Trial Court is amended, as above set forth, and, as amended, affirmed, awarding judgment in favor of Claude B. Triche, and against Commercial Union Insurance Company, John Monterio Construction Co., Inc., and Robert F. Eschete, Sr., in solido, in the full sum of $183,538.85, with interest from judicial demand, itemized as follows:

Lost Past Earnings $ 9,321.03
Loss of Future Earnings $137,217.82
Past and Future Suffering:
 (a) Inguinal hernia $ 3,000.00
 (b) Herniated disc $ 30,000.00
Medical Expenses $ 4,000.00
 ___________
TOTAL $183,538.85

For the foregoing reasons the judgment of the Trial Court is amended in part, and as amended, affirmed, at Appellants' costs.
Amended and affirmed.

ON APPLICATION FOR HEARING
PER CURIAM.
Defendants Commercial Union Insurance Company, et al., in their application for rehearing urged reconsideration of several aspects of our original opinion and, in addition, contend that the decretal portion of our opinion is ambiguous in that we fail to limit the liability of Commercial Union Insurance Company to the sum of $100,000.00, the limits of its liability under the policy issued by it to defendant, John Monterio Construction Company, Inc.
We concede that it was not our intention to increase the liability of the above named insurer to an amount in excess of its policy limits.
Accordingly, the last paragraph of our opinion is hereby changed to read:
For the foregoing reasons the judgment of the trial court is amended in part, and as amended, affirmed, limiting the liability of Commercial Union Insurance Company to the limits of its policy provisions.
All costs of this appeal are assessed against the appellants.
In all other respects and with this clarification, appellants' application for rehearing is refused.